**CONTINUATION IN SUPPORT OF SEARCH WARRANT**

I, Doug Kujacznski, hereby depose and state as follows:

1.      I make this continuation in support of an application for a warrant to search (i) a residence located at 217 Sunset Ave. NW, Grand Rapids, Michigan 49504 (the "Subject Premises"); and (ii) the person of JUSTIN WOLFRAM — each further described in Attachment A — to seize and analyze evidence, instrumentalities, or contraband related to criminal violations of 18 U.S.C. §§ 2251, 2252A, and 1591, as further described in Attachment B.

2.      This is a renewal application. The Hon. SALLY J. BERENS, United States Magistrate Judge, authorized the requested search on or about March 6, 2026, in case number 26-mj-99 on the basis of the facts described below. However, agents wished to effect the arrest of JUSTIN WOLFRAM prior to execution of the search warrant for security reasons, and they were unable to locate him within the 14-day execution period.

3.      However, on today's date (April 1, 2026), WOLFRAM was arrested by federal authorities. Members of the United States Marshal's Service witnessed WOLFRAM leaving 217 Sunset Ave. NW at approximately 3:35pm. Shortly, thereafter, officials effected a traffic stop and took WOLFRAM into custody.

4.      I am a Special Agent with Homeland Security Investigations assigned to the Office of the Resident Agent in Charge, Grand Rapids, MI.  I have been employed since February 2016. In 2016, I graduated from the Criminal Investigator Training Program and Homeland Security Special Agent training at the Federal Law Enforcement Training Center. While there I received specific training on cybercrimes where computers and the internet are used in the sexual exploitation of children, including (but not limited to) violations of 18 U.S.C. § 2252A, which forbids knowingly receiving or distributing child pornography, as defined in 18 U.S.C. § 2256(8).

5.      I have received formal and on-the-job training in the investigation of cases involving the sexual exploitation of children. In addition, I have been involved in and conducted numerous investigations regarding child pornography and exploitation, including by (i) participating in searches and seizures of computers and digital media; (ii) arresting and interviewing subjects; and (iii) forensically examining digital evidence.

6.      This continuation is based on information I personally obtained, as well as information I received from other investigators participating in this investigation. This Continuation is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.    Based on my training and experience, and the facts set forth herein, I believe there is probable cause that JUSTIN WOLFRAM committed crimes in violation of 18 U.S.C. §§ 2251, 2252A, and 1591 and also that the Subject Premises and JUSTIN WOLFRAM, both further described in Attachment A, contain or have evidence, instrumentalities, or contraband related to these crimes, as further described in Attachment B.

**PERTINENT STATUTE**

8.    This investigation concerns alleged violations pertaining to sexual exploitation and attempted sexual exploitation of children (18 U.S.C. § 2251), possession, receipt, and distribution of child pornography (18 U.S.C. § 2252A), and sex trafficking of children (18 U.S.C. § 1591) (the "Subject Offenses").

9.

**BACKGROUND AND PROBABLE CAUSE**

10.    On or around January 16, 2025, Royal Thai Police (RTP) Provincial Police Region 5 informed U.S. Homeland Security Investigations (HSI) Bangkok of an investigation into an individual allegedly engaging in commercial sex with minor girls in Chiang Mai, Thailand. During the investigation, RTP Provincial Police Region 5 made contact with a sixteen (16) year old Thai girl, hereafter referred to as Minor Victim 1 (MV1) who was engaging in commercial sex. RTP Provincial Police Region 5 stated that acts occurred in October 2024.

11.    During the encounter with MV1, RTP Provincial Police Region 5 obtained a photo that was retrieved from MV1's phone of an individual who was engaging in commercial sex with minor girls. HSI Bangkok assisted RTP Provincial Police Region 5 by running the individual's photo in a law enforcement database. From the analysis, the photo was a match to United States citizen (USC) named Justin David WOLFRAM. HSI Bangkok compared the photo of the individual from MV1's phone with WOLFRAM's U.S. Passport photo and determined that it was the same individual.

12.    Thai Immigration Bureau (TIB) ran checks on WOLFRAM and provided the following information and entry-exit records to and from Thailand:

- Name: Justin David WOLFRAM
- DOB: 06/13/1985
- U.S. Passport Number: 566257201
- Arrival    08/19/2024    KE667    ICN-CNX
- Departure  10/15/2024    Z2286    DMK-MNL
- Arrival    10/20/2024    Z2287    MNL-DMK
- Departure  10/27/2024    KE668    CNX-ICN

13.     The above states that WOLFRAM arrived in Seoul, South Korea (ICN) with a connecting flight into Chiang Mai, Thailand (CNX) on August 19, 2024. WOLFRAM departed Bangkok, Thailand (DMK) travelling to Manila, Philippines (MNL) on October 15, 2024. On October 20, 2024, WOLFRAM travelled from Manila, Philippines (MNL) to Bangkok, Thailand (DMK). On October 27, 2024, WOLFRAM departed Chiang Mai, Thailand (CNX) travelling to Seoul, South Korea (ICN).

14.     HSI Bangkok conducted a check on international travel records within DHS holdings and verified that WOLFRAM flew into Chaing Mai Airport on 08/19/2024 from the United States.

15.     On or around March 2, 2025, RTP Provincial Police Region 5, a social worker from RAPHA Foundation, and an HSI Investigator conducted an interview of MV1 at RAPHA Foundation's shelter, Doi Saket District, Chiang Mai, Thailand. MV1 stated that his/her mother had passed away, and he/she had been living with his/her father who has re-married to his current wife. MV1's father's wife has a 13-year-old child from her previous relationship, hereafter referred to as Minor Victim 2 (MV2).

16.     MV1 stated that around March 2024 he/she started engaging in commercial sex because the family's finances were in trouble. At first, MV1 was engaged in commercial sex alone, but later invited MV2 to engage in commercial sex as well.

17.     MV1 stated that the commercial sex acts continued through social media platforms in Chiang Mai and Lamphun provinces. Later, MV1 was contacted by a foreigner. MV1 stated that she could remember this foreigner precisely because he used his real image as his profile picture on the Line social media application.[1] RTP Region 5 officers showed an image of Justin David WOLFRAM to MV1. MV1 confirmed that WOLFRAM was the foreigner who reached out to her.

18.     MV1 stated that he/she first met WOLFRAM at his condominium, Supalai Monte 2 Condominium, in Thailand. On that day, MV1 and MV2, along with two other friends (one boy and one lady boy) went to meet WOLFRAM at the condominium. WOLFRAM got off the elevator to meet MV1 at the lobby. WOLFRAM also saw MV2 and the two other friends at the condominium's lobby. MV1 told MV2 and the two friends to wait at the lobby while MV1 went up to WOLFRAM's room. MV1 remembered that WOLFRAM's room was on the 27th floor.

19.     MV1 stated that after arriving at WOLFRAM's room, WOLFRAM asked MV1 who MV2 was, and whether MV2 would also engage in commercial sex. MV1 stated

---

[1] I know from my knowledge, training, and experience that social media platforms are often accessed by mobile electronic devices, such as a cell phone.

that he/she told WOLFRAM that MV2 would also engage in commercial sex. WOLFRAM then asked MV1 to escort MV2 to his room. MV1 stated that both MV1 and MV2 had sex with WOLFRAM on that day.

20.     During the first encounter, MV1 and MV2 told WOLFRAM that they were both 18 years old. Later, when MV1 went to engage in commercial sex with WOLFRAM again, WOLFRAM asked MV1 to help find young girls to have sex with him. MV1 then told WOLFRAM that MV1 was in fact 16 years old, and that MV2 was actually 13 years old. After that, WOLFRAM continued to engage in sexual acts with both MV1 and MV2 at the same time for at least five more occasions, sometimes at his condominium.

21.     After that, WOLFRAM also called MV2 to have sex with him on several other occasions at different locations, including motels in Chiang Mai, Thailand. He arranged to meet him/her at Bau-Tong Lodge and other motels in Chiang Mai city because WOLFRAM was afraid that his condominium neighbors would be the eyes and the ears for the police.

22.     After WOLFRAM departed Thailand, WOLFRAM continued to contact MV1 and MV2 and asked for two to three video clips of MV2 masturbating. WOLFRAM sent money to MV1's account in exchange for these masturbation video clips and other pornographic clips and pictures of MV2. MV1 stated that after receiving the money, he/she would withdraw the money and deposit it into another bank account. MV1 recalled that in or about October 2024, he/she received approximately 3,400 Thai baht (Thai currency) from WOLFRAM and deposited the amount into a Kasikorn bank account.

23.     On or about March 4, 2025, RTP Provincial Police Region 5, a social worker from ZOE Thailand Foundation, and an HSI Investigator conducted an interview of MV2 at the Anti Human Trafficking Center, Provincial Police Region 5, Chiang Mai, Thailand.

24.     MV2 stated that his/her mother remarried to MV1's father; hence becoming a stepbrother/stepsister of MV1. The RTP officers showed pictures of four foreigners to MV2. MV2 stated that he/she recognized one of the foreigners, identified as Justin David WOLFRAM. MV2 stated that he/she called him Michael or Justin.

25.     MV2 stated that he/she first met WOLFRAM at a high-rise building in Central Festival Chiang Mai's shopping mall area. He/she recalled that he stayed on the 27th floor. On that day, MV1 went to pick up MV2 from her apartment, and they went to WOLFRAM's building together. WOLFRAM saw MV2 waiting for MV1 in the lobby downstairs. Later, MV1 came down from WOLFRAM's room to ask MV2 to go up to WOLFRAM's room to have sex with him.

4

26.     MV2 stated that on the first day he/she met WOLFRAM, he/she told him that he/she was 18 years old, but later told him that he/she was actually 13 years old.

27.     MV2 stated that he/she and MV1 had been to WOLFRAM's building two to three times and had a three-person sexual encounter with MV1 and WOLFRAM once. On the other occasions, it was sex between MV2 and WOLFRAM. MV2 stated that WOLFRAM later arranged for MV1 and himself/herself to have sex with him at other locations in Chiang Mai. He/she recalled that it was at Bau-Thong Lodge and some other motels in Chiang Mai.

28.     After departing Thailand, WOLFRAM contacted MV1 and MV2 and asked MV2 to film pornographic video clips of himself/herself masturbating and send them to him. MV2 filmed the clips from his/her dormitory in San Kamphaeng District, Chiang Mai. WOLFRAM would pay 3,500 Thai baht for three video clips. WOLFRAM told MV2 to film each video clip at one minute in length.

29.     MV1 and MV2 communicated with WOLFRAM through the Google Translation application. The video clips were sent through Line, MV1's social media chat application, to WOLFRAM. After sending the clips, WOLFRAM would send money to MV1 and MV2 via bank transfers. MV2 could not remember which bank but recalled that it was a bank with a green logo.

30.     When asked about the video clips, MV2 was not sure whether MV1 had deleted the clips because they were recorded using MV1's phone. After sending the clip to WOLFRAM, MV2 had to wait about one to three days to receive the money. MV2 did not know how the money was sent because MV1 was the one who controlled all the money.

31.     MV2 stated that no one else, besides WOLFRAM, had ever asked MV1 and MV2 to take obscene pictures or video clips.

32.     During the interview, when MV2 was asked about the chat messages between MV1 and MV2, MV2 indicated that he/she told MV1 that he/she did not want to accept foreign customers anymore and explained that WOLFRAM's penis was too large, causing tears to MV2's genitals, but MV1 still forced MV2 to provide sexual services to other customers on the same day.

33.     MV2 believed that if he/she used MV1's phone to reach out to WOLFRAM, he/she should still be able to contact him. After the interview, the RTP officers brought MV1 and MV2 to confirm the crime scenes, including various hotels in Chiang Mai and Lamphun Province. RTP officers were able to confirm that WOLFRAM did reside in Supalai Monte 2 condominium on the 27the floor.

34.     On or about March 31, 2025, HSI Grand Rapids conducted a query via a law enforcement database for WOLFRAM. The checks revealed that WOLFRAM resided at 217 Sunset Ave NW, Grand Rapids, Michigan.

35.     On or about April 1, 2025, HSI Grand Rapids conducted surveillance at 217 Sunset Ave NW, Grand Rapids, Michigan. During the surveillance, investigators observed a Grey Chevrolet Impala bearing Michigan license plate 1JWF3 parked outside the residence. Michigan Secretary of State records confirm that this vehicle is registered to WOLFRAM at 217 Sunset Ave NW, Grand Rapids, Michigan. Investigators also observed a Black Pontiac Grand Prix bearing Michigan license plate 8MUG7 parked outside the residence. Michigan Secretary of State records confirm this vehicle is also registered to WOLFRAM at 217 Sunset Ave NW, Grand Rapids, Michigan.

36.     On April 16, 2025, WOLFRAM was encountered at the O'Hare International Airport in Chicago, Illinois by Customs and Border Protection (CBP) and HSI. WOLFRAM had electronic devices, including cell phones, in his possession. CBP and HSI conducted a border search of the devices and discovered that they each contained child pornography. Furthermore, CBP and HSI discovered that the Line social media application, previously mentioned above in this Continuation, was installed on the Samsung Galaxy A12 cellphone. CBP and HSI found chats in the Line application between WOLFRAM and females from October 2024 that contained explicit material that is sexual in nature. CBP and HSI also discovered the WhatsApp application installed on the devices. The WhatsApp application appeared to contain conversations between WOLFRAM and females that were similar in nature to the chats found in the Line social media application.

37.     In April 2025, HSI Grand Rapids obtained a federal warrant to search WOLFRAM's devices. Subsequent to the search, investigators were able to determine that 17 different storage devices had been attached to WOLFRAM's Western Digital sold state drive (HP Laptop) including WOLFRAM's Galaxy S25 Ultra cellphone. Investigators also noted that on several occasions various multimedia files were accessed on unknown storage devices while mounted to the Western Digital sold state drive (HP Laptop). Timestamps of these events remain largely unknown with the exception of April 10, 2025, and April 16, 2025, where access to multiple image and video files was recorded.

   a.   From this, I infer that WOLFRAM had access to multiple additional electronic storage devices that were not in his possession when he was contacted by CPB at O'Hare International Airport. Based on my training and experience, individuals with a sexual interest in minors and in sexual content featuring minors often store child pornography on electronic storage devices within their places of residence.

**WOLFRAM'S CONNECTION TO THE SUBJECT PREMISES**

38.    In February 2026, investigators conducted surveillance at the residence located at 217 Sunset Ave NW, Grand Rapids, Michigan.

39.    While conducting surveillance, investigators observed an individual matching the description of WOLFRAM around the residence located at 217 Sunset Ave NW, Grand Rapids, Michigan. At that time, investigators observed the individual enter into a Chevrolet Impala bearing license plate 1JWF3. Records checks were conducted on license Michigan license plate 1JWF3. Records returned that the license plate and car are registered to Justin WOLFRAM at the residence located at 217 Sunset Ave NW, Grand Rapids, Michigan. After the individual observed to be WOLFRAM enter into the vehicle, investigators observed the individual driving the car and departed the residence.

## CHARACTERISTICS OF PEOPLE WITH AN INTEREST IN CHILD PORNOGRAPHY

40.    Based on my training and experience, I know the following:

a.    People who use electronic devices to produce, possess, and distribute child pornography often amass vast collections of such material, and use multiple different devices to obtain and store it.

b.    Computers and other internet capable devices such as tablets and cellular telephones facilitate the collection and distribution of child pornography.

c.    The internet, including online chats platforms like Line, is commonly used as means and facility of interstate commerce, and it affords collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and seemingly-anonymous manner.

d.    Storage capacity of computers and portable storage media, such as USB or thumb drives, has grown tremendously within the last several years. These drives can store thousands of images at very high resolution, are easily transportable, and are relatively inexpensive. Advances in technology have significantly reduced the size of digital storage devices such that now large numbers of digital files can be stored on media that will fit in a person's pocket, on a keychain, or in any number of easily transportable and concealable places. An individual can now easily carry on his or her person storage media that contains thousands of files, including images, video files, and full length movie files.

e.    As with most digital technology, communications made from a computer device are often saved or stored on that device. Storing this information can be intentional, for example, by saving an email as a file on the computer or saving the location as a "favorite" website in a "bookmarked" file. Digital

7

information can also be retained unintentionally. Traces of the path of an electronic communication may be stored automatically in many places, such as temporary files or Internet Service Provider client software, among others. In addition to electronic communications, a computer user's internet activities generally leave traces in a computer's web cache and internet history files.

f.    A forensic examiner often can recover evidence that shows whether a computer device contains peer-to-peer software, when the device was sharing files, and some of the files that were uploaded or downloaded. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that date remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.

g.    Similarly, files that have been viewed via the Intern et are automatically downloaded into a temporary internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

h.    Searches and seizures of evidence from computers and computer devices commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following two reasons:

i.    Computer storage devices can store the equivalent of millions of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data that is available in order to determine whether it is included in the warrant that authorizes the search. This sorting process

8

can take days or weeks, depending on the volume of data stored, and is generally difficult to accomplish on site.

ii.      Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure that is designed to protect the integrity of the evidence and recover even hidden, erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

i.      In order to retrieve data fully from a computer system, the analyst needs all storage devices as well as the central processing unit. In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

j.      To examine the computer and digital media properly, it may also be necessary to seize certain other items including documentation of programs, passwords, notes, or even specialized hardware. Therefore, this warrant seeks permission to seize not only the digital storage media and to search it for evidence in the form of child pornography images or videos, stored emails associated with the receipt and distribution of such images, and any chat or other text files relating to contact with collectors of child pornography or with actual children, but also requests permission to seize all hardware, software, and computer security devices necessary to access and examine the computer storage media. Peripheral equipment including printers, routers, modems, network equipment used to connect to the Internet may also contain evidence of what devices were used to connect to the Internet, who used those devices, and what actions the person(s) performed while using such devices.

k.      Forensic examiners can also find the presence or absence of certain software and programs to determine who controlled a computer at a given time. Such evidence includes: viruses, Trojan horses, spyware, malware, and other

forms of malicious software; the presence or absence of security software designed to detect malicious software; the lack of malicious software; and the presence or absence of software designed to protect a device from infiltration, access, or control by another person or entity, which may include pop up blockers, security software, password protection, and encryption. Forensic examiners can also find evidence of software or programs designed to hide or destroy evidence.

l.     The time period required for a complete, safe, and secure forensic examination of the computer and storage media is uncertain.

## SPECIFICS PERTINENT TO SEARCHING COMPUTERS

41.     Based on my training and experience, I know the following:

a. People who use electronic devices to produce, possess, and distribute child pornography often amass vast collections of such material, and use multiple different devices to obtain and store it.

b. Computers and other internet capable devices such as tablets and cellular telephones facilitate the collection and distribution of child pornography.

c. People involved in sexual exploitation of children generally maintain their collections in a safe, secure, and private environment, most often where they live and/or on their person. These images and videos can be downloaded onto desktop or laptop computers, computer disks, disk drives, data disks, system disk operating systems, magnetic media floppy disks, Internet-capable devices, cellular telephones, tablets, digital music players, and a variety of electronic data storage devices (hardware, software, diskettes, tapes, CDs, DVDs, SD cards, memory cards, USB/jump/flash memory devices, external hard drives, and other digital storage media). The images can be stored in both digital and hard copy format and are usually hidden so that they are not found by other members of the residence or by anyone else who enters the home. Such hiding places could include but are not limited to garages, sheds, attics, vehicles, bags, and pockets. Digital files and devices may be password protected, encrypted, or otherwise protected.

d. The internet, including online chats platforms like Kik, is commonly used as means and facility of interstate commerce, and it affords collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and seemingly-anonymous manner.

e. Storage capacity of computers and portable storage media, such as USB or thumb drives, has grown tremendously within the last several years. These drives can store thousands of images at very high resolution, are easily transportable, and are relatively inexpensive. Advances in technology have significantly reduced the size of digital storage devices such that now large numbers of digital files can be stored on media that will fit in a person's pocket, on a keychain, or in any number of easily transportable and concealable places. An individual can now easily carry on his or her person storage media that contains thousands of files, including images, video files, and full length movie files.

f. As with most digital technology, communications made from a computer device are often saved or stored on that device. Storing this information can be intentional, for example, by saving an email as a file on the computer or saving the location as a "favorite" website in a "bookmarked" file. Digital information can also be retained unintentionally. Traces of the path of an electronic communication may be stored automatically in many places, such as temporary files or Internet Service Provider client software, among others. In addition to electronic communications, a computer user's internet activities generally leave traces in a computer's web cache and internet history files.

g. A forensic examiner often can recover evidence that shows whether a computer device contains peer to peer software, when the device was sharing files, and some of the files that were uploaded or downloaded. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that date remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.

h. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary internet directory or "cache." The browser typically

maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

i. Searches and seizures of evidence from computers and computer devices commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following two reasons:

i. Computer storage devices can store the equivalent of millions of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data that is available in order to determine whether it is included in the warrant that authorizes the search. This sorting process can take days or weeks, depending on the volume of data stored, and is generally difficult to accomplish on site.

ii. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure that is designed to protect the integrity of the evidence and recover even hidden, erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

j. In order to retrieve data fully from a computer system, the analyst needs all storage devices as well as the central processing unit. In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware

configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

k. To examine the computer and digital media properly, it may also be necessary to seize certain other items including documentation of programs, passwords, notes, or even specialized hardware. Therefore, this warrant seeks permission to seize not only the digital storage media and to search it for evidence in the form of child pornography images or videos, stored emails associated with the receipt and distribution of such images, and any chat or other text files relating to contact with collectors of child pornography or with actual children, but also requests permission to seize all hardware, software, and computer security devices necessary to access and examine the computer storage media. Peripheral equipment including printers, routers, modems, network equipment used to connect to the Internet may also contain evidence of what devices were used to connect to the Internet, who used those devices, and what actions the person(s) performed while using such devices.

l. Forensic examiners can also find the presence or absence of certain software and programs to determine who controlled a computer at a given time. Such evidence includes: viruses, Trojan horses, spyware, malware, and other forms of malicious software; the presence or absence of security software designed to detect malicious software; the lack of malicious software; and the presence or absence of software designed to protect a device from infiltration, access, or control by another person or entity, which may include pop up blockers, security software, password protection, and encryption. Forensic examiners can also find evidence of software or programs designed to hide or destroy evidence.

m. The time period required for a complete, safe, and secure forensic examination of the computer and storage media is uncertain.

**SEARCH AUTHORIZATION REQUEST**

42.    Based on the above, I submit there is probable cause to believe that JUSTIN WOLFRAM violated federal laws pertaining to sexual exploitation and attempted sexual exploitation of children (18 U.S.C. § 2251), possession of child pornography (18 U.S.C. § 2252A), and engaging sex trafficking of children (18 U.S.C. § 1591) (the "Subject

13

Offenses") and that the Subject Premises and JUSTIN WOLFRAM contain or have evidence, instrumentalities, or contraband related to this crime.

43.     I respectfully request that this Court issue request a warrant to search the Subject Premises and JUSTIN WOLFRAM,  both further described in Attachment A, for evidence, instrumentalities, and contraband related to this crime, as further described in Attachment B.

## SEARCH PROTCOL

44.     Investigators plan to search the Subject Premises and Subject Person for any material described in Attachment B.

45.     The government will make available for pick-up within a reasonable time all items found not to contain any contraband or material to be seized pursuant to the warrant and all hardware and software no longer needed for examination purposes. In conducting the search, the forensic examiner and agents will examine files regardless of their name because such names and file extensions can be altered to conceal their actual content. Because of the volume of data to be searched and the need to complete the examination in a reasonable time, the forensic examiner will also use computer techniques such as keyword searches that may result in the display of irrelevant materials.

## REQUEST FOR AUTHORIZATION TO UNLOCK DEVICES

46.     Based on my knowledge and experience, and information provided to me by others, I know that certain electronic devices may be locked and/or unlocked by personal identification numbers ("PIN"), gestures or motions, and/or with biometric features, such as thumb and fingerprint recognition (collectively, "fingerprint ID") and/or facial recognition ("facial ID").

47.     If a user enables the fingerprint ID unlock feature on a device, he or she can register several fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's sensor, which typically is found on the front of the device. In my training and experience, users of devices that offer fingerprint ID or facial ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

48.    In some circumstances, a fingerprint or face cannot be used to unlock a device, and a passcode or password must be used instead. Depending on the configuration of the security settings on the phone, the opportunity to unlock the device via fingerprint ID or facial ID exists only for a short time. Fingerprint ID and facial ID also may not unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) several unsuccessful attempts to unlock the device are made.

49.    Investigators do not know whether any of the electronic devices stored in the Subject Premises are protected by any of the above security features. However, in the event that one or more devices is so protected, the passcode(s) or password(s) that would unlock the device(s) is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) or present the face of the user(s) of the device(s) found during the search to the device's fingerprint ID or facial ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant device(s) via fingerprint ID or facial ID is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

50.    Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the device(s), this will result in the device requiring the entry of a password or passcode before it can be unlocked.

51.    Based on the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of WOLFRAM to the fingerprint ID sensor or to present his face to the facial ID sensor of any seized device(s) to attempt to unlock any devices seized under this warrant in order to search their contents as authorized by this warrant.

52.    I am advised by the United States Attorney's Office for the Western District of Michigan of the following:

    a.    In *United States v. Payne*, 99 F.4th 495 (9th Cir. 2024), the Ninth Circuit held that the use of compelled biometrics to unlock a device does not necessarily violate a defendant's Fifth Amendment rights. Specifically, that "the compelled use of [the defendant]'s thumb to unlock his phone (which he had already identified for the officers) required no cognitive exertion, placing it firmly in the same category as a blood draw or fingerprint taken at booking. The act itself merely provided [law enforcement] with access to a source of potential information." *Id*. at 512.

b.   In a separate case, the Court of Appeals for the D.C. Circuit held that an agent had violated a suspect's Fifth Amendment right against self-incrimination by ordering a suspect to unlock his own phone. *United States v. Brown*, 125 F.4th 1186, 1204 (D.C. Cir. 2025). "When, in response to the command to unlock the phone, [the suspect] opened it, that act disclosed his control over the phone, his knowledge of how to access it, and the existence, authenticity, and ownership of the documents within it." *Id.* This was "tantamount to answering a series of interrogatories," and, therefore, the order to unlock implicated the suspect's Fifth Amendment right against compelled self-incrimination. *Id.*

c.   These cases are not in conflict. The D.C. Circuit reasoned that it's holding was consistent with the Ninth Circuit's holding in *Payne* because in "that case, instead of instructing the defendant to open his phone, as the FBI instructed [the Brown defendant] to do, the police 'forcibly grabbed Payne's thumb and used it to unlock the phone.'" *Id.* at fn. 2 (quoting *Payne*, 99 F.4th at 500). The *Payne* court reasoned that biometric unlocking is not *per se* non-testimonial. *Payne*, 99 F.4th at 513. Biometric unlocking can be testimonial, as it was in *Brown*, if an officer requires a suspect "to independently select the finger" used to unlock a device. *Id.* Absent testimonial acts requiring "cognitive exertion" by a suspect, compelled biometric unlocking does not implicate the Fifth Amendment. *Payne*, 99 F.4th at 512-13.